Edward W. Swanson, SBN 159859
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for JAMIE HARMON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>vs.<br><br>JAMIE HARMON,<br><br>                   Defendant. | No. CR 08-0938 LHK<br><br>**DEFENDANT JAMIE HARLEY'S SENTENCING MEMORANDUM**<br><br>Date:  January 14, 2015<br>Time:  9:30 a.m.<br>Court: Hon. Lucy H. Koh |

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................................ iii

   I.    Introduction ............................................................................................................................ 1

   II.   Sentencing Guidelines and Factual Objection .................................................................. 2

   III.  The Court Should Impose a Sentence of Home Detention ............................................... 3

        A.     The Nature and Circumstances of the Offense ...................................................... 3

        B.     The History and Characteristics of the Defendant ................................................. 4

        C.     The Need to Reflect the Seriousness of the Offense,
                  Promote Respect for the Law, and Provide Just Punishment .............................. 11

        D.     General and Specific Deterrence ......................................................................... 13

   IV.  The Court Should not Impose a Fine ................................................................................ 14

   V.   Conclusion .......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) .................................................. 12

*United States v. Emmenegger*, 329 F.Supp.2d 416 (S.D.N.Y. 2004) ......................................... 12

*United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993) ......................................................... 14

*United States v. Redemann*, 295 F.Supp.2d 887 (E.D.Wis. 2003) .............................................. 14

*United States v. Walters*, 87 F.3d 663 (5th Cir. 1996) ................................................................ 13


**Regulations**

31 C.F.R. § 1010.100 ....................................................................................................................... 3

31 C.F.R. § 1010.311 ....................................................................................................................... 3


**Other Authority**

Allan Ellis, *At a Loss for Justice: Federal Sentencing for Economic Offenses*,
Criminal Justice, Vol. 25, No. 4 (2011) ....................................................................................... 12

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*,
20 Fed. Sent. R. 167 (2008) ........................................................................................................ 12

### I. Introduction

Ms. Harley submits this memorandum in support of her request that the Court impose a sentence of home detention, a reasonable sentence in light of the statutory factors set forth in section 3553(a).

Ms. Harley is not disputing the offense conduct for purposes of these proceedings. And she acknowledges that the conduct for which she was convicted occurred in connection with her work as an attorney, a factor the Court may consider in aggravation. But in considering the proper punishment, counsel respectfully requests the Court take into account the collateral consequences Ms. Harley has already suffered. As a result of her actions in returning funds to her client, Christian Pantages, some 11 years ago, Ms. Harley's life has fundamentally changed. She has been engaged for over five years in criminal proceedings in connection with those transfers. During that time, and as a result of the criminal case, Ms. Harley lost her bar license, her livelihood, her professional reputation, and her life savings. Apart from the close community of family and friends that have remained at her side, Ms. Harley has almost nothing left of the life she led before she made those transfers.

However, counsel submits that what is even more important in determining the appropriate punishment is all of the other acts that make up Ms. Harley's life. The way in which she returned funds to her client in this one case does not define Ms. Harley as a person or a lawyer. As the many letters attached to this submission demonstrate, Ms. Harley was an extraordinarily dedicated attorney, committed both to her clients' cases and to their personal lives. She practiced almost without drawing boundaries between her professional duties and her desire to help people in their personal lives, sometimes to her detriment. She may not have been adept at the business of running a law practice. But again and again, her clients and others in her

life describe her as extraordinarily generous and caring. As one client writes, "Words can't possibly describe how grateful I am to her for the love and support she provided for me while my family was so far away. She IS my family and always will be." Shawn Campo letter, Exhibit A at 1.

Counsel submits that a sentence of home detention is appropriate in light of Ms. Harley's history and personal characteristics. It is also sufficient to achieve the sentencing objectives set out in18 U.S.C. § 3553(a). In light of the collateral consequences of this conviction, such a sentence would be just punishment. No additional penalty would be necessary to achieve deterrence. Ms. Harley had never before committed a crime, and there is no danger of her doing so in the future. Nor is there any risk that anyone seeing what has happened to Ms. Harley would think it worthwhile to launder money for a client.

Thus, Ms. Harley respectfully requests that the Court impose a sentence of home detention. Ms. Harley also requests that the Court decline to impose a fine.

## II. Sentencing Guidelines and Factual Objection

Ms. Harley agrees with the PSR's guidelines calculations. The adjusted offense level is 18. Ms. Harley is in Criminal History Category I, yielding a guidelines range of 27-33 months.

Ms. Harley has one factual objection to the PSR. The Probation Department writes that Ms. Harley "systematically distributed the funds, all in amounts of $10,000 or less, to Pantages and his wife." PSR, Recommendation at 3. Similarly, in ¶ 21 the PSR states that Ms. Harley "converted a check for $54,050 into five cashier's checks, each in the amount of $10,000." That is not the case. It was Mr. Pantages, not Ms. Harley, who converted the $54,050 check into cashier's checks. *See* RT 1002 (Pantages testifying that he received the check from Ms. Harmon and purchased five cashier's checks for $10,000, taking the balance in cash); RT 491-494

(signatures of person who bought the cashier's checks match Pantages's endorsement signature on the back of the $54,050 check).

Nor is it accurate to suggest that Ms. Harley engaged in structuring. The PSR states that "banks are required to file . . . [a] Currency Transaction Report for transactions greater than $10,000" and submits that this reporting requirement "may explain why Harmon issued three checks on January 7, 2004 to Harry, each in the amount of $10,000, and on February 5, 2004, why Harmon converted a check for $54,050 into five cashier's checks, each in the amount of $10,000." PSR, ¶ 21. Federal law does require banks to report certain transactions using the Currency Transaction Report, but only transactions in currency. *See* 31 C.F.R. § 1010.311 (CTRs are required for "each deposit, withdrawal, exchange of currency or other payment or transfer . . . which involves a transaction in currency of more than $10,000"); 31 C.F.R. § 1010.100(m) (defining "currency" as "[t]he coin and paper money of the United States"). None of the transactions at issue here was made with currency. All involved checks. Because there were no currency transactions, there was no reporting requirement to evade, and Ms. Harley did not engage in structuring.

### III. The Court Should Impose a Sentence of Home Detention

Ms. Harley respectfully disagrees with the PSR's recommendation of 27 months, the low end of the guidelines range. Under the unique circumstances of this case, a custodial sentence is "greater than necessary" to achieve the statutory goals of sentencing, 18 U.S.C. § 3553(a), and Ms. Harley respectfully requests that the Court impose a sentence of home detention.

#### A. The Nature and Circumstances of the Offense

Ms. Harley stands convicted of laundering five checks sent to her client, Christian Pantages, and his wife. The Court is well aware of the factual background to this case, and Ms.

Harley will not repeat it at length here. Nor will she dispute any of the jury's findings for purposes of these proceedings. Rather, counsel wishes to point out that Ms. Harley did not receive any financial gain from issuing the checks in this fashion; all of the money went to Chris Pantages and Ingrid Harry. Further, there is no evidence that Ms. Harley engaged in money laundering or any other criminal activity at any other point in her life.

**B.      The History and Characteristics of the Defendant**

Ms. Harley had been a criminal defense attorney for 20 years at the time she was engaged by Mr. Pantages. The offense of which she was convicted occurred in connection with her work as a lawyer, and that will obviously factor into the Court's determination of the appropriate sentence. But counsel asks the Court to recognize that while Ms. Harley committed errors as an attorney, she nevertheless provided her clients with dedicated and professional representation. The attached letters describe an attorney who was extraordinarily passionate about her work and compassionate towards her clients. Ms. Harley's commitment to her clients' plight, both within and without the legal system, was extraordinary – frankly, beyond anything undersigned counsel has observed in other attorneys, much less in himself. It does not excuse her errors, but it does provide context and counterweight to the error she is convicted of having made here in connection with her work as an attorney.[1]

Ms. Harley's husband describes her as "an excellent attorney who was truly dedicated to her clients. The amount of pro-bono work she has done goes unnoticed and she never did it because she wanted recognition but because she believed in the client." Mark Harley letter,

---

[1] The PSR notes that Ms. Harley informed the Probation Department she was suffering withdrawal from Vicodin, prescribed after a severe accident, at the time of the offense conduct. While that is true, Ms. Harley is not asking the Court to base its sentencing decision on that fact.

Exhibit A at 14.  But it is her former clients who paint the most revealing picture of the sort of attorney Jamie Harley was.  As one such client writes, Ms. Harley "believed in me and fought for me.  It was because of her efforts, her knowledge of the system, and her genuine care and concern for me as a man and as a professional that the charges in my case were ultimately dismissed. . . . She provided me with a unique blend of comfort, compassion, confidence, professionalism and competence that made me feel safe in her care."  A.S. Oberei letter, Exhibit A at 10.  A family member of another client writes:

> I was so amazed by Jamie's compassion and non-judgmental approach. She held my family's member hand and consoled her and told her "everything would be okay."  In short, my family member believed her.  Jamie had the ability to connect with her and make her feel like she was not alone.  Also, my family member was suffering, though not aware of this, with a serious medical issue, which caused her to not be herself.  Jamie realized this after meeting with her, and encouraged her to seek treatment.  The family member did see a doctor, and got some medicine, which changed my family member's life.

Sabahete Kraja letter, Exhibit A at 6.  Ms. Kraja notes that Ms. Harley's work was particularly impressive given that it took place during this case: "Jamie's help was amazing, but especially, when I later learned that Jamie was going through the beginning of her own personal difficulties in life/court.  What impressed me was that Jamie was able to give her entire self and see this case through to the end while Jamie was dealing with her own personal challenge."  *Id.*

Hard-working attorneys are not uncommon.  What set Ms. Harley apart in the eyes of her clients was her dedication not just to their cases but to them personally. Gladys Medina describes how Ms. Harley's help went well beyond addressing the charges facing Ms. Medina's husband:

> I met Jamie Harley when my husband was accused of sex crimes he did not do. He was put in jail and I was alone to care for my twin girls and son.  I did not have a job, and my husband really needed to have a lawyer. . . . We did not have money, but Jamie did not care about that.  She took only a little money and kept his case for all the time.  She went to a trial with him that last more than three weeks, and he was found by a jury innocent.  That was not the end of my troubles.

> My husband was deported to Mexico and did not able to come back to United States. Jamie and her husband Mark help us or we would been homeless on the streets. They give us furniture and helped me to find jobs. They buy my kids clothes and toys and take my son on vacation to Hawaii with them. They have birthday parties for my kids when I have no money to make sure my kids felt OK. Jamie Harley help me fix my car when it was broken down, and take care of us more than our own family.

Gladys Medina letter, <u>Exhibit A</u> at 3. Nor is Ms. Medina's story unique. Leah Martinez, whom Ms. Harley represented in a 7-year custody battle, writes that Ms. Harley helped encourage her young son to perform well in school: "Each good report card he got, she let him pick out a pair of shoes he wanted. To this day, he speaks highly of Jamie as do I." Leah Martinez letter, <u>Exhibit A</u> at 5. Mario Anguiano, for whom Ms. Harley secured a reversal of a life sentence on appeal and who was retried after Ms. Harley's suspension, writes that "[e]ven though she was not my attorney, Jamie was there outside with my family after I was acquitted .... she was there for me and my family as a friend while I was incarcerated, she still has been there for me and that is why I feel I need to be there. Without her I wouldn't have my new family .... without her I wouldn't have the drive to start over and continue my beautiful life I have now, better than before. I owe her everything. I do." Mario Anguiano letter, <u>Exhibit A</u> at 8-9. Another client writes that while he could "discuss the merits of Jaime Harley's legal skills all day," it would "do nothing to define the true nature of her beautiful soul." Shawn Compo letter, <u>Exhibit A</u> at 1. Ms. Harmon reached a favorable resolution of Mr. Compo's case, but what impressed him most was how she continued to help him afterwards:

> When I was released from jail, Jaime helped to pick me up from the gutter. She acted as a liaison for my family to send me necessities. She helped me find employment, which is no small task for someone with a criminal record. I was homeless, she helped me find a room. When I was broke, she was there for me. When I was hungry, she fed me. When I was sad, she comforted me. When I needed confidence, she gave me an ear-full of pep talks. Words can't possibly describe how grateful I am to her for the love and support she provided for me

> while my family was so far away.  She IS my family and always will be.  I witnessed this kind of compassion and assistance that Jaime provided for me many times over for other clients as well.

*Id.*  Ms. Harley went so far as to hire Mr. Compo as an assistant in her office (*id.*), something she also did for others who needed help getting back on their feet.  As an employee, Mr. Compo was amazed that Ms. Harmon "carried so much stress and worry for her clients," writing that it was "nothing out of the ordinary to see tears in her eyes when speaking of clients and their legal situations."  *Id.*; *see also* Tami Roth letter, Exhibit A at 23 ("When I was down and out and needed it most, Jamie hired me as an Assistant in her office, which I was very grateful for.  What I found was that she was not only a great Attorney but I got to see how she interacted with her clients on a daily basis.  What I witnessed was an intelligent, professional and sincere person.  Her clients were treated with respect and dignity.").

Ms. Harley was not a perfect attorney.  The PSR notes her 2010 suspension by the State Bar (PSR, Recommendation at 3), which was based on conduct in 2002, 2003, and 2006.  But it is important to note, as the State Bar did, that "[t]he hearing judge found Harley and her witnesses to be credible and concluded that she did not commit any acts of dishonesty or moral turpitude, stating: 'The gravamen of her misconduct is her failure to properly manage her busy criminal practice.'"  Opinion on Review, *In the Matter of Jamie Harley*, 05-O-03395, at 2.[2]

---

[2] The State Bar Court also found "most compelling" the "strong evidence of good character" presented in mitigation.  The Review Department wrote:

> Nine witnesses testified, including three judges, an attorney, a former client, friends, and former law enforcement officers.  [Citation.]  These character witnesses have known Harley between one to 20 years and attested to her excellent reputation in the legal community and her honest character.  Their opinions did not change despite knowing about the charges against her, and several witnesses have referred friends or family members to Harley for legal representation.

7

**Defendant's Sentencing Memorandum**
*United States v. Harmon*, CR 08-0938 LHK

Ms. Harley's dedication to the welfare of others, even to her own detriment, is not confined to her professional life. She suffered a difficult and traumatic childhood, with a father who was both emotionally and physically abusive. PSR, ¶¶ 48-53. She was constantly afraid as a child, and she responded both by exceling academically and by striving to become a "people pleaser." PSR ¶ 53. She continued that course throughout her life, even through her own battles with alcoholism and depression. *See* PSR ¶¶ 67-74. Again and again, letters submitted in her support speak to her selflessness, her commitment to family and community, and her willingness to go above and beyond to help not just her clients but anyone in need.

The most recent and prominent example concerns Ms. Harley's neighbor, Brooke Bailey. When Ms. Bailey was diagnosed with breast cancer, Ms. Harley took it upon herself to assume responsibility for her care, nursing her and supporting her until her death in the fall of 2014. As Brooke's sister writes:

> Jamie asked Brooke if she needed a friend in her battle against cancer and the rest is history. Jamie's many endearing characteristics of endless humor, love, tenacity, organization, brilliant researching, indefatigable cheerleading, and loyalty were amazing gifts to both Brooke and all of us in Brooke's family. Jamie forged a bond with Brooke that took Brooke triumphantly (in the best health possible along a naturopathic path of Brooke's choice) through the next two years until she died of her disease on Aug. 22nd with Jamie alongside of her with the rest of the family.

---

We expressly note the highly relevant testimony of three superior court judges, all of whom assert that Harley handles very difficult criminal cases and is an outstanding advocate for her clients. Retired Judge Ray Cunningham has known Harley over 20 years and testified that he would "rank [Harley] among the highest attorneys we have." Judge Jerome Brock, who has known Harley 18 years, testified that her reputation is "excellent," and she does "a great job with her clients." Finally, Judge Edward Lee has known Harley 20 years and testified that she is regarded as "competent and a good attorney to work with." The hearing judge found that this un-rebutted testimony demonstrated an extraordinary showing of good character from a wide range of references, and that the mitigation overall was "compelling." We agree and assign it significant weight.

*Id.* at 16 (opinion available at http://members.calbar.ca.gov/courtDocs/05-O-03395-2.pdf).

> . . .
>
> Jamie's husband and children sometimes joined in these past 2 years of carrying the Bailey household through very rough times. But it was Jamie, always Jamie, who was there to laugh, cry, research, transport, shop, accompany to appointments, clean, comfort, and help in every way possible to make Brooke's final journey a peaceful and happy one given very difficult circumstances. Jamie is a remarkable lady and person and has become a close friend to us all. The gift she gave Brooke was just priceless and a comfort to us all.

Nancy Trenbeth letter, <u>Exhibit A</u> at 18-19. Ms. Bailey's husband echoes the family's gratitude for all Ms. Harley took upon herself, writing that Ms. Harley "ma[de] herself available in every possible way. For example, she helped in organizing our house to make in more peaceful, established the schedule of meds, performed research, took her to doctor appointments, helped her reason when confusion and pain caused fear and doubts, she helped her see ways of making peace, and in loving ways, and healing touches, in talking things through, in documenting her last wishes, and by helping her stay focused and strong." Gary Bailey letter, <u>Exhibit A</u> at 20; *see also* Ashleigh Huffman letter, <u>Exhibit A</u> at 21-22.

Ms. Harley's dedication to caring for her neighbor was extraordinary, but it was by no means a surprise to those around her. Throughout her life, as the attached letters attest, she has worked to help others in the community. Ms. Harley's friend Jennifer Duran writes that "Jamie is one of those people who doesn't ask you if you need help. She just knows when you do and she does it. And not just for my family, but for whoever is in need. She does it from the goodness of her heart and does not expect anything back. She amazes me with her kindness and generosity. I and my family feel so blessed to have her in our lives." Jennifer Duran letter, <u>Exhibit A</u> at 25. A friend of Ms. Harley's daughter writes that "Jamie opened her home to me without any hesitation and helped me not to feel so homesick. She acted as a mother to my coworkers and myself and without her support I do not believe I would have been as successful."

Michele Vizzo letter, Exhibit A at 28. Tami Roth, a struggling alcoholic whom Jamie sponsored through AA, writes that "When I was down and out and needed it most, Jamie hired me as an Assistant in her office, which I was very grateful for. . . . Jamie helped me in a very difficult time and believed in me when I couldn't believe in myself. For this I will always be grateful." Tami Roth letter, Exhibit A at 23.

Ms. Harley's character in this regard is perhaps best summed up by her 21-year-old daughter Samantha:

> For my entire life I have felt extremely grateful for my mother's career. I believed that it was her job as a lawyer that taught me balance, compassion, and integrity. It has only been since this ordeal that I have come to realize that those are not simply characteristics of my mom as a lawyer, but as a person. Throughout my life I have seen her put everyone before herself, and do things for people that have gone above and beyond her duties. If we define integrity as the alignment of our values and our actions, my mother is the human embodiment of the word. I have watched her strike the most beautiful balance between her home life and her career that I could have ever imagine possible. These qualities make my mother not simply a good person, but a great person.

Samantha Harley letter, Exhibit A at 12.

Ms. Harley was an attorney who identified with her clients, tried to help them in every way she could, and took on their burdens as her own. Often that resulted in remarkable results, both in and out of court. Sometimes, it resulted in a practice whose demands she could not manage, as her desire to help her clients overwhelmed her ability to stay on top of the day-to-day demands of a business. But helping her clients, not financial gain, was what motivated her as attorney. The crime she is convicted of having committed should be weighed against Ms. Harley's substantial legacy of good as an attorney, rather than erase it or cast it all in a negative light. In short, Ms. Harley's history and characteristics and the nature and circumstances of the offense make a sentence of home confinement reasonable.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Ms. Harley has already suffered real punishment as a result of this case. She has lost her job, irreparably harmed her personal and professional standing, and spent her life savings as well as her husband's. In light of the personal and professional devastation brought about by this case, a prison term is not necessary to reflect the seriousness of the offense, to promote respect for the law, or to provide just punishment.

As noted above, Ms. Harley's job as a criminal defense lawyer was more than just a career to her. Her friend Sherrie Clark writes that Ms. Harley's job "was her passion. She was great at defending her clients and had an incredible amount of compassion for the less fortunate." Sherrie Clark letter, Exhibit A at 30. The actions that led to the conviction in this case have destroyed Ms. Harley professionally. She surrendered her law license after her conviction in this matter, and the expense of defending this case coupled with the loss of income has been financially ruinous. Ms. Harley is currently struggling to prevent a foreclosure sale of her house. But more importantly, as Mr. Harley writes, this case "has been devastating, emotionally, physically and spiritually." Mark Harley letter, Exhibit A at 14. Her daughter Samantha writes:

> Life has not been easy throughout this case. It has caused many tears and honest conversations, and it has broken relationships with people outside of our family. I would not wish this experience on my worst enemy, but I am also grateful for the bonds it has created with the people who have stood by my mother. Our family has endured degrading news articles and attention, hateful words, and financial turmoil. We have almost lost our house, which still potentially hangs in the balance, and we have struggled to pay for our education.

Samantha Harley letter, Exhibit A at 12.

A sentence of home detention is adequate because of the extra-judicial punishment Ms. Harley has endured and will continue to endure. She has suffered the personal and professional

embarrassment of being a criminal defense lawyer convicted of multiple felonies based on her professional actions. She has permanently lost her ability to work in her chosen field. She can no longer support her family, forcing her 68-year-old husband back into the workforce. *See* Mark Harley letter, <u>Exhibit A</u> at 14. She and Mr. Harley face continuing financial hardship, including questions about their ability to pay for their children's education and keep their home.

    A sentence of imprisonment is also excessive because the Guidelines range in this case overstates the seriousness of the offense. Ms. Harley faces an advisory sentence of 27-33 months due to a Guidelines range driven largely by the amount of laundered money. Guidelines sentences increase with the amount of funds at issue because the Commission has determined the amount of money should act as a proxy for the severity of criminal conduct. However, courts and legal scholars have repeatedly criticized the Guidelines on these grounds. *See*, *e.g.*, *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (guidelines loss figure is often "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); Allan Ellis, *At a Loss for Justice: Federal Sentencing for Economic Offenses*, Criminal Justice, Vol. 25, No. 4 (2011) (analyzing sentences in high-loss white collar fraud cases and concluding that the data "strongly suggests that loss is a poor proxy for offense seriousness"); Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167 (2008) (data suggests "that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for [high-loss white

collar fraud] cases . . . and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives").

Even if it were true in general that more money a defendant launders, the more the she has benefited and thus the more deserving of punishment she is, it is not the case here.  Ms. Harley did not benefit personally from laundering funds.  Her legal fees for representing Mr. Pantages were not based on the size of the SVR checks or on how much she transferred back to her client.  She was charged with and convicted of laundering $87,000 not because she set out to launder that amount (indeed, she was not convicted of conspiring to commit money laundering) but because that was the amount Mr. Pantages asked her to return to him.  Thus, a guidelines sentence driven by the amount of money at issue misrepresents the seriousness of her offense and warrants a variance pursuant to 18 U.S.C. § 3553(a).  *Cf*., U.S.S.G. § 2B1.1, Application Note 20(C) (downward departure may be warranted where "the offense level determined under this guideline substantially overstates the seriousness of the offense"); *see*, *e.g*., *United States v. Walters*, 87 F.3d 663, 671 (5th Cir. 1996) (in money laundering case, district court reasonably departed downward where defendant did not personally benefit from the fraud).

### D.     General and Specific Deterrence

Nor is a sentence of imprisonment necessary to deter others from committing the same crime or to protect the public from future criminal activity by Ms. Harley.  Anyone looking at what happened to Ms. Harley as a result of her returning money to Mr. Pantages – a six-year legal process accompanied by professional, personal, and financial ruin – would not be tempted to launder funds for a client.  And Ms. Harley herself is at no risk of committing crimes in the future.  She had never engaged in criminal behavior before meeting Mr. Pantages and, other than

a traffic infraction, has engaged in none over the more than eleven years that have passed since the transactions at issue here.

The Probation Department argues that the extrajudicial consequences Ms. Harley has suffered do not justify a below-guidelines sentence because "it was her own conduct that created the predicament she now finds herself [sic]." PSR, Recommendation at 3. But that is precisely why a more lenient sentence is appropriate. Because of the conviction in this matter, the law requires that Ms. Harley be punished in order to satisfy the statutory objectives set forth in § 3553(a). Where some of those objectives have already been accomplished by virtue of collateral consequences of the criminal proceedings, a reduced sentence is appropriate. *See*, *e.g.*, *United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993) (defendant ran criminal scheme through his business and lost the business and all income as a result of his prosecution; downward departure was appropriate (even under mandatory Guidelines regime) because "[e]limination of the defendant's ability to engage in similar or related activities – or indeed any major business activity – for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence"); *United States v. Redemann*, 295 F.Supp.2d 887, 895 (E.D.Wis. 2003) (in a pre-*Booker* case, departing downward because "the purposes of sentencing were at least partially achieved prior to the initiation of this prosecution" by virtue of extrajudicial consequences of conviction).

### IV.     The Court Should not Impose a Fine

The PSR recommends a $6,000 fine, finding Ms. Harley can afford it because she "has a negative net worth, but a positive monthly cash flow." PSR, ¶ 91. Ms. Harley's net worth is negative by some $66,000 (*id.* at ¶ 84), and that does not include some $423,000 in tax liens. *Id.*

at ¶ 87.  It is true that, at the moment, the family has a monthly net income of $2,275 (*id.* at ¶ 84), although that does not take into account Ms. Harley's ongoing legal expenses.  Regardless, the only reason cash flow is positive is because Ms. Harley and her husband have been unable to pay their $2,500 monthly mortgage for over a year.  *Id.* at ¶ 85.  They are now struggling to prevent a foreclosure sale of their house.  If they are successful, they will go back to making monthly mortgage payments, and cash flow will be negative again.  If they are unsuccessful they will lose the house, forcing them to pay rent somewhere and making it impossible to afford a fine.  Ms. Harley therefore respectfully requests that the Court decline to impose a fine.

**V.    Conclusion**

Based on the foregoing, Ms. Harmon respectfully submits that home detention is sufficient but no greater than necessary to satisfy the statutory goals of punishment and requests that the Court impose that sentence.

Dated: January 7, 2015                                     Respectfully submitted,

                                                           /s/
                                                           Edward W. Swanson
                                                           August Gugelmann
                                                           SWANSON & McNAMARA LLP
                                                           Attorneys for JAMIE HARMON